AUG 28 2002

30

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CHRISTIAN COMMUNITY ACTION, INC., et al.,
Plaintiffs,

v.

CITY OF NEW HAVEN, et al.,
Defendants.

Civil No. 3:91cv00296(AVC)

RULING ON THE PLAINTIFFS' MOTION FOR ATTORNEY'S FEES AND COSTS

This is an action for injunctive and declaratory relief. It is brought pursuant to 42 U.S.C. § 1983, as well as various other federal housing statutes and regulations.

The plaintiffs, Christian Community Action, Inc., as well as eight individuals, have filed the within motion for attorney's fees and costs incurred in connection with monitoring of the defendant city of New Haven's compliance with the 1999 settlement agreement entered into between the parties and approved by the court.[1]

The issues presented are: 1) whether the plaintiffs are prevailing parties under 42 U.S.C. § 1988; 2) whether the settlement agreement bars the award of attorney's fees for post-judgment monitoring; 3) whether the attorney's fees sought are for monitoring or for voluntary consulting work; and 4) whether the hourly rate requested is reasonable.

The court concludes that: 1) the plaintiffs are prevailing parties; 2) the settlement agreement does not bar attorney's fees for post-judgment monitoring; 3) the attorney's fees

---

[1]The motion is brought pursuant to 42 U.S.C. § 1988, which provides, in pertinent part, that "[i]n any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title . . ., the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

EXHIBIT I

sought are for monitoring of the city of New Haven's compliance with the settlement agreement, and are therefore compensable; and 4) the hourly rate sought is reasonable. Therefore, the plaintiffs' motion for attorney's fees and costs is GRANTED.

FACTS

Examination of the 1999 settlement agreement and the affidavits submitted in connection with the within motion for attorney's fees reveals the following:

In 1991, the plaintiffs, Christian Community Action, Inc. ("CCA") and eight individuals, brought suit against the defendants, the secretary of the United States Department of Housing and Urban Development ("HUD"), the housing authority of the city of New Haven ("HANH"), the city of New Haven ("New Haven"), and several city of New Haven officials, alleging violations of the United States Fair Housing Act, the United States constitution, and various housing statutes and regulations. In July 1995, the plaintiffs, HUD, and HANH entered into a court-ordered settlement agreement. In July 1999, the plaintiffs, New Haven, and the New Haven officials entered into a settlement agreement. The court preliminarily approved the settlement agreement and ordered that a fairness hearing be conducted so that the court could determine whether the settlement agreement was fair, reasonable, and adequate. After the fairness hearing, the court approved the settlement agreement. On July 21, 1999, the court entered judgment in accordance with the terms and conditions of the settlement agreement.

The settlement agreement provides, in relevant part, as follows:

> New Haven and [the] other remaining City Defendants continue to deny any liability in the case, but wish to resolve this litigation in a constructive manner consistent with the City's own housing policy goals without the need for further time consuming and expensive court proceedings.

New Haven will create and fund a new regional housing mobility counseling program . . . administered by a non-profit or not-for profit agency. . . . The contractor . . . selected to run the counseling program will be selected by an open proposal process based on a set of ranking criteria to be agreed to by the parties. Plaintiffs' counsel shall be consulted in the design of the Request for Proposals and shall be represented on the Committee charged with interviewing and selecting the contractor. If plaintiffs disagree with the proposed selection of a contractor, they may file a motion with the Court.

[New Haven] shall operate a three-year testing effort in the New Haven area, by means of a series of contracts not to exceed one year, subject to annual renewal at the City's option upon performance by the contractor that is satisfactory.

[New Haven] agrees to invite plaintiffs' and plaintiffs' counsel to participate in a committee to assist in the formation of its comprehensive housing plan, in its revision of the Analysis of Impediments to Fair Housing Choice, and in the other specific fair housing efforts set out below. Plaintiffs' counsel shall also be invited to provide formal input into the revised drafts of these reports.

As part of the fair housing planning process . . ., [New Haven] shall also be required to undertake a regional fair housing planning process. . . . . [New Haven] shall report to plaintiffs' counsel any governmental entity which refuses to participate in the regional fair housing planning process, or otherwise interferes with [New Haven's] efforts to promote regional low income housing development or regional housing mobility.

Without conceding any entitlement by plaintiffs to fees and costs, defendant City of New Haven shall pay to plaintiffs' counsel the sum of seventy-five thousand ($75,000) dollars in full satisfaction of plaintiffs' claims for attorneys' fees and costs for prosecution of this action.

The Court shall retain jurisdiction over the parties to this Settlement Agreement, after its entry, for the purpose of enabling any party to the Agreement to apply to the Court for such further orders as may be necessary or appropriate for the enforcement of this Agreement. The Court's jurisdiction over this Agreement shall terminate upon the City's discharge of all of its responsibilities under the Agreement. The Court's jurisdiction over this Agreement shall terminate after the completion of the final year of funding for the RHOC program, as set forth in paragraph 9(a).

On March 11, 2002, the plaintiffs filed the within motion for attorney's fees and costs seeking $9,446.25 in attorney's fees and $201.34 in costs in connection with monitoring New Haven's compliance with the 1999 court-ordered settlement agreement.

STANDARD

"A court has few duties of a more delicate nature than that of fixing counsel fees." Hayward v. Plant, 98 Conn. 374, 382 (1922). "The general rule of law known as the 'American rule' is that attorney's fees and ordinary expenses and burdens of litigation are not allowed to the successful party absent a contractual or statutory exception." Alyeska Pipeline Serv. Co. v. Wilderness Soc., 421 U.S. 240, 247 (1975). Section 19[illegible] of Title 42 of the United States Code, provides, in pertinent part, that "[i]n any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title . . ., the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988.

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services." Hensley v. Eckerhart, 461 U.S. 424, 433 (1986). This calculation is referred to as the "lodestar." See Orchano v. Advanced Recovery, Inc., 107 F.3d 94, 98 (2d Cir. 1997). "After calculating the lodestar, the district court may consider other factors, 'that may lead [it] to adjust the fee upward or downward, including the important factor of 'results obtained.'" Id. (quoting Hensley, 461 U.S. at 434). The United States Court of Appeals for the Fifth Circuit set out the factors a court may use to determine the appropriateness of an upward or downward adjustment of the lodestar amount in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974). The factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the

> fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Hensley v. Eckerhart, 461 U.S. 424, 430 n.3 (1983). "[T]he fee applicant bears the burden of establishing entitlement to an award and documenting the appropriate hours expended and hourly rates." Id. at 437.

DISCUSSION

I. Prevailing party

The plaintiffs argue that they are entitled to attorney's fees in connection with their monitoring of New Haven's compliance with the 1999 settlement agreement because they were prevailing parties in this action.

New Haven responds that "this case was disposed of by Settlement Agreement, so there has been no determination that [the] plaintiffs were in fact the prevailing parties thus entitling them to an award of attorney['s] fees and costs . . . and [the] plaintiffs do not make such a claim. (Were they to now do [so] four years after the Settlement Agreement we would dispute such a claim of prevailing party, both as untimely and substantively unjustified.)"

"Congress . . . has authorized the award of attorney's fees to the 'prevailing party in numerous statutes . . . such as . . . the Civil Rights Attorney's Fees Awards Act of 1976, . . . 42 U.S.C. § 1988." Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 602 (2001). "In designating those parties eligible for an award of litigation costs, Congress employed the term 'prevailing party,' a legal term of art." Id. at 603. The Supreme Court "ha[s] held that settlement agreements enforced through a consent decree may

serve as the basis for an award of attorney's fees." Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 604 (2001)(citing Maher v. Gagne, 448 U.S. 122 (1980)). "Although a consent decree does not always include an admission of liability by the defendant, it nonetheless is a court-ordered 'chang[e] [in] the legal relationship between [the plaintiff] and the defendant.'" Id. (quoting Texas State Teachers Assn. v. Garland Independent Sch. Dist., 489 U.S. 782, 792 (1989)) (internal citation omitted). "[E]nforceable judgments on the merits and court-ordered consent decrees create the 'material alteration of the legal relationship of the parties' necessary to permit an award of attorney's fees." Id. (quoting Texas State Teachers Assn., 489 U.S. at 792-93.

A. Court-ordered consent decree

In Truesdell v. Philadelphia Hous. Auth., 290 F.3d 159, 165 (3d Cir. 2002), the court held that, based upon the district court's order, the plaintiff was a prevailing party for the purposes of an attorney's fees award under 42 U.S.C. § 1988. The court reviewed the characteristics of the court order, emphasizing that the order "(1) contain[ed] mandatory language . . ., (2) [was] entitled 'Order,' and (3) [bore] the signature of the [d]istrict [c]ourt judge, not the parties' counsel." The court also emphasized the fact that the order gave the plaintiff "the right to request judicial enforcement of the settlement against [the defendant.]" Id.

In Roberson v. Giuliani, 99CIV109000, 2002 WL 253950, at *3 (S.D.N.Y. Feb. 21, 2002), the court held that the settlement agreement entered into between the parties was "neither an enforceable judgment on the merits nor a court-ordered consent decree." "The [a]greement acknowledged that an intended beneficiary of the [a]greement could seek to enforce the [a]greement in [the district] [c]ourt and that attorney's fees and costs would be available under

Section 1988 for any post-judgment enforcement action." Roberson v. Giuliani, 99CIV109000, 2002 WL 253950, at *2 (S.D.N.Y. Feb. 21, 2002). "The court retained jurisdiction to enforce the [a]greement. Although a copy of the [a]greement was provided to the [c]ourt, the [a]greement was neither filed with nor 'so ordered' by the [c]ourt." Id. There was no notice to the putative class members and the court did not conduct a fairness hearing in connection with the settlement agreement. See id. The court noted that "[its] continuing jurisdiction in order to enforce the terms of the [a]greement [did] not . . . constitute a 'judicial sanctioning' of the alteration of [the parties'] legal relationship such that the plaintiffs can be considered prevailing parties under the Buckhannon standard." Id. at *3. The court went on to discuss the numerous differences between settlement agreements in which the court retains jurisdiction over the agreement and consent decrees. "When a district court is asked to approve a consent decree, it must make at least a 'minimal determination of whether the agreement is appropriate to be accorded the status of a judicially enforceable decree.'" Id. at *3 (quoting United States v. Int'l Bus. Machines Corp., 163 F.3d 737, 740 (2d Cir. 1998)). "When the 'suit[] affect[s] the public interest, . . . the court must [also] be satisfied of the fairness of the settlement.'" Id. at *4 (quoting Janus Films, Inc. v. Miller, 801 F.2d 578, 582 (2d Cir. 1986)). "A 'consent judgment or decree' is defined as 'an agreement of the parties entered upon the record with the sanction and approval of the [c]ourt.'" Id. at *5 (quoting Schurr v. Austin Galleries, Inc., 719 F.2d 571, 574 (2d Cir. 1983)).

The court concludes that the 1999 settlement agreement entered into is in this action a consent decree for the purposes of determining whether the plaintiff is a prevailing party. The court reviewed and approved the terms of the settlement agreement, the court conducted a fairness hearing in connection with the settlement agreement, the court incorporated the terms of

the settlement agreement into the judgment, and the court retained jurisdiction over the enforcement of the settlement agreement. See Truesdell v. Philadelphia Hous. Auth., 290 F.3d 159 (3d Cir. 2002); Roberson v. Giuliani, 99CIV109000, 2002 WL 253950 (S.D.N.Y. Feb. 21, 2002). Since the 1999 settlement agreement is a consent decree, the plaintiffs are prevailing parties under 42 U.S.C. § 1988.

II AVAILABILITY OF ATTORNEY'S FEES

The plaintiffs next argue that, as prevailing parties, they are entitled to reasonable attorney's fees for the time their counsel spent in post-judgment monitoring of New Haven's compliance with the settlement agreement. The plaintiffs also argue that attorney's fees are provided for as a matter of law and that they are entitled to those fees because they have not expressly and voluntarily waived their right to such fees as part of the settlement agreement.

New Haven responds that "there is no provision for compensation of any sort for the roles for plaintiffs' counsel expressly contemplated by the Settlement Agreement and for which plaintiffs' counsel are manifestly seeking the fee award. Had there been any contemplation of payment of fees for the roles of plaintiffs' counsel contemplated by the Settlement Agreement and for which they now seek the award it would have had to be provided within the Settlement Agreement or expressly reserved in such Settlement Agreement. No such provisions were included. The parol evidence rule should now preclude such a claim."

"[T]he Supreme Court has held that reasonable attorney's fees may be awarded under [42 U.S.C.] § 1988 for certain post-judgment monitoring of consent decrees." Hispanics United of Dupage v. Village of Addison, 157 F. Supp. 2d 962, 965 (N.D. Ill. 2001). In that case, the defendant "contend[ed] that the plaintiffs' counsel verbally agreed that the attorneys' fees

component of the settlement was to be the full compensation for legal services associated with this litigation, including any post-decree legal services, with an exception for attorney work precipitated by 'a substantial violation of the Consent Decree.'" Hispanics United of Dupage v. Village of Addison, 157 F. Supp. 2d 962, 966 (N.D. Ill. 2001). "[T]his alleged agreement [was] not mentioned in any binding document entered into between the parties." Id. The only evidence the defendant presented in support of this verbal agreement was affidavits of two of its officials "which do not supply any specific details about the alleged oral agreement." Id. The plaintiffs' counsel denied that there was any agreement between the parties. See id. The court recognized that "under basic contract principles, if Plaintiffs had intended to release the Village's future obligation to pay attorneys' fees, the decree or the Stipulation Between Private Plaintiffs and the Village of Addison . . . should have contained some language expressly indicating such an agreement." Id. at 967 (citing Eirhart v. Libby-Owens-Ford Co., 996 F.2d 846, 849 (7th Cir. 1993)). The attorney's fee provision in the agreement stated as follows:

> "In full accord and satisfaction of any and all claims made or which could have been made for attorneys' fees and costs incurred for the work resulting in the entry and approval of this Consent Decree by the District Court, defendant agrees to pay and plaintiffs agree to accept a total of $2.5 million."

Id.

> By its own terms, th[is] . . . language only covers the entry and approval of the decree. Nothing is said about claims for fees regarding the enforcement or implementation of the decree. Moreover, an objective evaluation of the entire breadth and terms of the decree contemplates extensive future action on the part of the Village. The numerous, far-reaching elements of the decree make clear that enforcement will require the full cooperation of the Village as well as substantial continued efforts on the part of Plaintiff's counsel. . . . Thus, even a sample of initiatives required under the decree makes clear the enormous ongoing efforts that will be required on the part of Plaintiffs' attorneys to properly represent their clients and ensure full compliance with the decree.

Id. at 968. The court concluded that the plaintiffs were entitled to attorney's fees in connection

with monitoring of the settlement agreement. See Hispanics United of Dupage v. Village of Addison, 157 F. Supp. 2d 962, 968-69 (N.D. Ill. 2001).

In Burt v. County of Contra Costa, C-73-0906, 2001 WL 1135433, at *1 (N.D. Cal. Aug. 20, 2001), the plaintiffs moved for reasonable attorney's fees and costs for monitoring and enforcing a 1975 consent decree. "Under the Consent Decree, the County was required to pay $1,142.00 in costs and $10,428.00 in attorneys' fees. . . . The Consent Decree [did] not contain any provision explicitly addressing the cost of monitoring. According to the [defendant's attorney], he did not believe at the time the terms of the Consent Decree were negotiated that the County would be required to pay any attorneys' fees or costs beyond those explicitly provided for under the Consent Decree 'despite the fact that the County's obligations under the Consent Decree would extend into the future.'" Id. at *2. "[T]he Consent Decree provided for continuing jurisdiction of the Court, as follows: '[t]he Court will retain jurisdiction of these actions to assure compliance with the Affirmative Action program. After five years from entry of this Consent Decree, either party by noticed motion may apply to the Court for an order vacating such decree and dismissing these actions on the ground that further supervision of the Court is not necessary.'" Id. After the court entered the consent decree, the plaintiffs' substituted counsel engaged in numerous monitoring efforts. Id. at *3-5. The plaintiffs moved for attorney's fees and costs in connection with those monitoring efforts. Id. at *1. "The Court . . . reject[ed] Defendants' contentions that fees should not be awarded because the Decree does not specifically provide for attorneys' fees for monitoring. Attorneys' fees are available to prevailing parties unless 'the defendant shows that the plaintiff clearly waived fees as part of the settlement.'" Id. at *10 (quoting Muckleshoot Tribe v. Puget Sound Power & Light, 875 F.2d 695, 697 (9th Cir.

1989)). The court concluded that "the language of the Consent Decree does not manifest a clear intent to waive Plaintiffs' statutory right to seek attorneys' fees under Title VII for future monitoring. Rather, the Consent Decree, while providing for the payment of a specified amount in attorneys' fees already incurred, simply fails to address the possibility of attorneys' fees for post-judgment monitoring. . . . [In addition,] the conduct of the parties [does not] manifest a clear intent to waive the right to seek attorneys' fees for monitoring." Burt v. County of Contra Costa, C-73-0906, 2001 WL 1135433, at *10 (N.D. Cal. Aug. 20, 2001).

Here, the settlement agreement provides as follows: "Without conceding any entitlement by plaintiffs to fees and costs, defendant City of New Haven shall pay to plaintiffs' counsel the sum of seventy-five thousand ($75,000) dollars in full satisfaction of plaintiffs' claims for attorneys' fees and costs for prosecution of this action." The provision, as in Burt, provides for attorney's fees incurred up to the date that the consent decree was approved by the court. There is no indication within this provision that the plaintiffs intended to waive their right to seek attorney's fees for monitoring New Haven's compliance with the agreement. Therefore, the plaintiffs are entitled to an award of reasonable attorneys' fees in connection with their post-judgment monitoring.

III. MONITORING vs. CONSULTING

The plaintiffs argue that the attorney's fees sought represent compensable monitoring activities performed by their counsel. The plaintiffs also argue that "[u]nder the terms of the decree in this case, certain specific monitoring activities are expressly provided, including plaintiffs' right to review Requests for Proposals for the Regional Housing Opportunity Counselor (RHOC), their right to interview and provide input into the selection of that Counselor,

their right to review guidelines for financial assistance provided to RHOC clients, and their right to provide input into the selection of a fair housing consultant. Each of these provisions in the decree was negotiated to enable plaintiffs to specifically monitor the City's compliance with the terms of the consent decree for the benefit of the plaintiffs: not to provide some specialized expertise to the City or to serve some 'citizenship' function." "The activities for which the plaintiffs seek compensation, as set forth in their time records fall squarely within [the] definition [of monitoring as 'watch[ing], observ[ing], or check[ing]']."

New Haven responds that "the agreement permitted plaintiffs' counsel to play a direct role as consultant and participant in actual quasi-governmental programs. Such direct participation is not 'monitoring' of programs but, rather, actual participation therein. No provision whatsoever was made for compensation for such direct participation and absent provision for compensation none is required." "As is, by the Settlement Agreement plaintiffs' counsel have negotiated themselves guaranteed part[-]time service on a quasi-governmental body, but they did not negotiate any compensation for that voluntary service. Thus, the Settlement Agreement contemplates that plaintiffs' counsel will play a role in actually carrying out the Agreement. That is far different from 'monitoring' the Agreement."

The court concludes that the activities engaged in by the plaintiffs' counsel constitutes monitoring of the settlement agreement, not voluntary consulting work. The court agrees with the plaintiffs that the settlement agreement provisions at issue allow the plaintiffs' counsel to be directly involved in monitoring New Haven's compliance with the settlement agreement. Instead of having the plaintiffs' counsel review New Haven's selection of a contractor for the regional housing mobility counseling program and New Haven's comprehensive housing plan after the fact

and seek judicial intervention if the plaintiffs disagree with New Haven's decisions, the settlement agreement allows the plaintiffs' counsel to monitor New Haven's decision making process from the beginning. The court does not agree that these provisions convert the plaintiffs' counsel into consultants for New Haven. New Haven cites no legal authority to support its argument that because the settlement agreement allows the plaintiffs and their counsel to be direct involved in ensuring New Haven's compliance with the agreement, the plaintiffs and their counsel engaged in consulting work, not monitoring work. In addition, the court finds no caselaw to support such a conclusion.

IV REASONABLE HOURLY RATE

The plaintiffs argue that the rates requested, namely $275 per hour for both attorneys Philip D. Tegeler and Shelley White, "[are] well within the prevailing rate for counsel of similar experience, education, and background." In support of this motion, the plaintiffs have filed three affidavits from other attorneys in the community "who are familiar with the billing rates for lawyers who practice in the District of Connecticut." The plaintiffs also argue that "[i]n the absence of affirmative proof of the prevailing market rate, a federal court may consider the rates which other Connecticut courts found reasonable."

New Haven responds that, in support of their motion, the plaintiffs rely upon the erroneous standard of the rate billed or charged, instead of the rate actually awarded in the area for similar work performed by similarly skilled attorneys. New Haven also argues that, when courts have applied the proper attorney's fees standard, the hourly rate has been lower than the rate requested by the plaintiffs. Finally, New Haven argues that the proper hourly rate for plaintiffs' counsel for legal work is between $200 and $250 per hour and that the "if the

[plaintiffs] are to be compensated for work [done by plaintiffs' counsel] on the City body (1) even $200.00 is far more than the City pays to retained counsel for the City, and (2) plaintiffs have offered no evidence at all [as to] what rates are appropriate for consulting and administrative work for which the plaintiffs actually seek compensation."

"The caselaw is clear that reasonable fees under § 1988 are to be calculated 'according to the prevailing market rates in the relevant community, regardless of whether plaintiff is represented by private or nonprofit counsel.'" Tsombanidis v. City of West Haven, 208 F. Supp. 2d 263, 272 (D. Conn. 2002)(quoting Blum v. Stenson, 465 U.S. 886, 896 (1984)). "'[T]he burden is on the fee applicant to produce satisfactory evidence–in addition to the attorney's own affidavits–that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation. A rate determined in this way is normally deemed to be reasonable, and is referred to–for convenience–as the prevailing market rate.'" Id. at 273 (quoting Blum, 465 U.S. at 896 n.11). "It has been this Court's experience that fee applicants generally have supported their applications with their own affidavits as well as the affidavits of other practitioners in the area with comparable skill and experience. At the same time, given the broad discretion afforded the Court, the Court is not precluded from considering actual fees awards." Id. (citation omitted).

Here, the plaintiffs seek an hourly rate of $275 for both attorney Phillip Tegeler and attorney Shelley White. Upon review of Tegeler's affidavit and supplemental affidavit, the court notes the following: 1) in 1982, Tegeler graduated from Columbia Law School; 2) in 1984, Tegeler was admitted to the Washington and Connecticut state bars; 3) in 1987, Tegeler began working at that Connecticut Civil Liberties Union Foundation ("CCLUF") in Hartford,

Connecticut; 4) Tegeler is now the legal director for the CCLUF; 5) since 1989, Tegeler has been an adjunct professor at the University of Connecticut School of Law, where he has taught courses such as "Housing and Civil Rights," "Schools, Housing, and Racial Equity," and "Advanced Civil Procedure: Class Actions, Declaratory Judgments, and Institutional Reform Litigation"; 6) prior to working at the CCLUF, Tegeler was a full-time member of the clinical faculty at the University of Connecticut School of Law, where he taught students in the civil litigation clinic; 7) Tegeler has prosecuted numerous fair housing cases, as well as other civil rights cases; and 8) Tegeler has published several articles on civil rights and housing issues. Tegeler states that he has spent eleven hours of monitoring New Haven's compliance with the settlement agreement and that he has spent 5.6 hours traveling in connection with that monitoring work between June 1, 1999 and December 31, 2001.

Upon review of White's affidavit, the court notes the following: 1) in 1977, White graduated from Boston College Law School; 2) in 1980, White was admitted to the Connecticut state bar; 3) from 1977 to 1979, White worked for Georgia Legal Services as a staff attorney; 4) from 1979 to 1980, White worked for the Legal Services Training and Advocacy Project in Hartford, Connecticut as a legislative liaison; 5) from 1980 to 1982, White worked for the Office of Protection and Advocacy for Handicapped and Developmentally Disabled Persons in Hartford, Connecticut; 6) from 1982-1987, White worked for the CCLUF as an attorney; 7) since 1987, White has worked for the New Haven Legal Assistance Association, Inc. Association, Inc. as its litigation director; 8) as litigation director, White "develop[s], manage[s] and supervise[s] all federal cases and state court class actions and appeals" and White acts as "co-counsel [in] cases in federal and state court with other attorneys employed by this program as well as attorneys from

the other Connecticut legal services programs, the Office of Protection and Advocacy, the [CCLUF], and Yale Legal Services"; 9) White has participated in numerous civil rights cases, including class action and housing cases; and 10) since 2001, White has been the James Cooper Fellow with the Connecticut Bar Foundation. White states that she has spent 20.55 hours monitoring New Haven's compliance with the settlement agreement between March 2000 and December 2001.

In addition to the affidavits submitted by White and Tegeler, the plaintiffs submitted an affidavit from attorney Margaret Mason.[2] Mason's affidavit indicates that she is "familiar with the billing practices of [her] law firm and the prevailing rates for attorneys generally in the New Haven area." After reviewing the affidavits of Tegeler and White, Mason concluded that "the hourly rates which New Haven Legal Assistance Association, Inc and the [CCLUF] are billing for their services in connection with this petition for attorneys fees are well within the prevailing rates for attorneys of their education and experience for litigation in the United States District Court for the District of Connecticut." The plaintiffs also submitted copies of affidavits from attorney William Bloss[3] and attorney William Bright, Jr.[4] Those affidavits were filed in October 2001 in

---

[2]Mason, an attorney licensed to practice in the state of Connecticut, is a partner at the law firm of Tyler, Cooper and Alcorn, which has offices in New Haven, Connecticut.

[3]Bloss is a member of the law firm of Jacobs, Grudberg, Belt, and Dowd in New Haven, Connecticut. Bloss "is familiar with the rates charged by attorneys in Connecticut for competitive reasons and because [he] serve[s] on [his] firm's committee that sets hourly rates for [their] own services."

[4]Bright is a partner at the Hartford, Connecticut office of Cummings and Lockwood. As part of his work, Bright is "required to track market rates for trial attorneys and paralegals in Connecticut, as well as establish hourly billable rates for all of the attorneys and paralegals in [the firm's trial practice] group." Since 1987, Bright has been practicing law at Cummings and Lockwood.

Doe v. Lee, 3:99cv314(RNC), in which Tegeler sought $250 an hour in connection with his attorney's fees application. Bloss' affidavit states the following: "The hourly rates sought by [Tegeler] are well within the . . . prevailing rates within Connecticut for ordinary civil and civil rights litigation. . . . The rates sought by Attorney[] Tegeler . . . also properly reflect[] [his] experience and the nature of [his] practice[]." Bright's affidavit states the following: "I believe that the rates of . . . $250-$275/hour (for attorneys with more than 15 years experience) sought by the plaintiffs' attorneys in this case are at or below the prevailing market rates in the community."

Based upon these affidavits, as well as several recent district of Connecticut attorney's fees awards, the court concludes that an hourly rate of $275 for both Tegeler and White are reasonable and reflect the prevailing market rate for attorneys of their experience in Connecticut.[5] See Tsombanidis v. City of West Haven, 208 F. Supp. 2d 263 (D. Conn. 2002)(awarding, pursuant to 42 U.S.C. § 1988, an hourly rate of $275 to an attorney with seventeen years legal experience); LaPointe v. Windsor Locks Bd. of Educ., 162 F. Supp. 2d 10, 18 (D. Conn. 2001)(awarding, in a 42 U.S.C. § 1983 action, an hourly rate of $275 to an attorney in Manchester, Connecticut who had twenty years of experience); Evanauskas v. Strumpf, 3:00cv1106, 2001 WL 777477 (D. Conn. June 27, 2001)(awarding, in a consumer credit case, an

---

[5]The court notes that hourly rate for the 5.6 hours of travel time requested in Tegeler's affidavit is $137.50, fifty percent of the reasonable hourly rate of $275. See Williams v. New York City Hous. Auth., 975 F. Supp. 317, 324 (S.D.N.Y. 1997)(reimbursing travel time at fifty percent of the attorney's hourly rate). The court also notes that the reasonable hourly rate should not be based upon the amount New Haven pays its counsel, as New Haven argued in its opposition. New Haven cites no authority to support this argument and the court cannot find any such authority. In addition, the reasonable hourly rate should not be reduced for work New Haven considers consulting or administrative work, as the court has concluded that the work performed by the plaintiffs' counsel was monitoring work.

hourly rate of $275 to attorney Joanne Faulkner).

V. ATTORNEY'S FEES AND COSTS AWARDED

The plaintiffs seek a total of $9,446.25 in attorney's fees, $3,795.00 for Tegeler and $5,651.25 for White, and $201.34 in costs. New Haven "object[s] to fees for multiple attorneys." However, New Haven does not specify any reasons for its objection, nor does New Haven object to the number of hours expended by either attorney for their monitoring activities.

Having carefully reviewed the time records of both Tegeler and White, the court concludes that the number of hours expended for the monitoring work performed by both attorneys is reasonable. The plaintiffs' counsel's work in monitoring New Haven's compliance with the settlement agreement involved reviewing and commenting upon fair housing plans and contractor proposals, meeting with New Haven staff, co-counsel, the plaintiffs, and others involved in the fair housing planning process, and writing letters and e-mails regarding the New Haven regional housing opportunity center. Such work is compensable as monitoring activities. See West v. Manson, 163 F. Supp. 2d 116, 118-19 (D. Conn. 2001)(granting attorney's fees for similar monitoring activities).

CONCLUSION

Based on the foregoing reasons, the plaintiffs' motion for attorney's fees and costs (document no. 280) is GRANTED.

It is so ordered this 26TH of August, 2002 at Hartford, Connecticut.

Alfred V. Covello
Chief United States District Judge

JUN 2 8 2004

# ITEMIZED AND VERIFIED BILL OF COSTS

UNITED STATES COURT OF APPEALS
FILED
JUN 2 3 2004
Roseann B. MacKechnie, CLERK
SECOND CIRCUIT

United States Court of Appeals
For The Second Circuit

---

RONNI RABIN, ET. AL.
*Plaintiffs-appellants*

No. 03-7572

VS.

PATRICIA WILSON-COKER,
Commissioner of the Connecticut
Department of Social Services,
in her official capacity
*Defendant-appellee*

APRIL 6, 2004

Counsel for Plaintiffs-Appellants respectfully submits, pursuant to Rule 39(c) of the Federal Rules of Appellate Procedure the within bill of costs and requests the Clerk to prepare an itemized statement of costs taxed against the Defendants-Appellees and in favor of Plaintiffs-Appellants for insertion in the mandate.

| | |
|---|---|
| Costs of printing Appendix (necessary copies 12) | $ 272.16 |
| Costs of printing Brief on Appeal(necessary copies 13) | $ 146.25 |
| Costs of printing Reply Brief (necessary copies 13) | $ 101.10 |
| Costs of printing Exhibits (necessary copies 6) | $ 51.60 |
| Costs of printing Motion for Injunction Pending Expedited Appeal (necessary copies 5) | $ 110.57 |
| Total: | $ 681.68 |

STATEMENT OF COSTS

Taxed in the amount of $ 571.11 in favor of Appellants

Reduced per FRAP 39 to exclude motion costs -

FOR THE COURT:
ROSEANN B. MacKECHNIE, Clerk

6/23/04
Date

Tracy W. Young
Tracy Young, Administrative Attorney

EXHIBIT J

I hereby swear that the foregoing is true to the best of my knowledge and belief.

By:

SHELLEY A. WHITE (ct05727)
New Haven Legal Assistance Association
426 State Street
New Haven, CT 06510
Phone: 203.946-4811 x.116
FAX: 203.498-9271
swhite@nhlegal.org

**CERTIFICATE OF SERVICE**

This is to certify that a copy of the foregoing Itemized and Verified Bill of Costs has been mailed on this 5th day of April, 2004, first class, postage prepaid to: Hugh Barber, Assistant Attorney General, 55 Elm Street, P.O. Box 120, Hartford, CT 06141-0120.

Shelley A. White, Esq.